```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF PUERTO RICO


ALVIN MARRERO-MÉNDEZ,

    Plaintiff


         v.                         CIVIL NO. 13-1203 (JAG)


HÉCTOR PESQUERA, et al.,

    Defendant
```

## OPINION AND ORDER

Alvin Marrero-Méndez ("Marrero" or "Plaintiff"), individually and on behalf of the conjugal partnership comprised by him and his spouse Cynthia Pérez-Valentin (collectively, "Plaintiffs"), brought this civil rights suit against defendants Hector Pesquera, William Orozco, Guillermo Calixto-Rodríguez, Mario Rivera, and Ricardo Cruz-Domínguez (collectively, "Defendants") of the Puerto Rico Police Department ("PRPD") for allegedly infringing upon Marrero's First Amendment right of free exercise of religion. Essentially, Plaintiffs claim that during an official PRPD meeting, Marrero was coerced by his superior officer to observe the rest of his peers performing a Christian prayer. And, during the prayer, Plaintiffs allege that Marrero was not allowed to leave.

Defendants now move to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6), and also raise a qualified immunity defense. (See Docket Nos. 59-61). For the reasons outlined below, the Court grants in part Defendants' 12(b)(6) motions and denies the Defendants' qualified immunity defense.

**BACKGROUND**

Marrero has worked for the PRPD as a police officer since 1999. (Docket No. 1 at ¶ 10). During these thirteen years, his duties as an officer have included patrolling, attending to complaints, conducting arrests, dealing with the public, and undertaking other crime-prevention activities. Id.

On March 9, 2012, around 7:30 p.m., the Carolina Area Commander at that time, defendant Guillermo Calixto-Rodríguez ("Calixto"), summoned forty PRPD police officers to a shopping mall in Carolina to discuss a plan for an intervention that was to take place nearby. Id. at ¶ 23. All the officers, Marrero included, stood in formation during the meeting. Id. at ¶ 24.

According to the complaint, these meetings customarily included a Christian invocation or closing prayer. Id at ¶ 37. Accordingly, Calixto asked for a volunteer to close the meeting with a prayer. Id. This time, however, Marrero called Calixto aside and told him that "he objected to such official prayers because they promote[d] religious beliefs to which he [did] not

subscribe." Id. at ¶ 25. He further informed his superior officer that "he felt very uncomfortable taking part in the prayer and that he did not want to participate." Id.

In response, Calixto ordered Plaintiff to abandon the formation, and Marrero separated himself from the formation. Id. at ¶ 26. As Marrero walked away, Calixto ordered Marrero to stop and stand still until the prayer was finished. Then, in front of the formation, Calixto shouted that Plaintiff was standing apart from everyone else because "he doesn't believe in what we believe." Id. Marrero recounts that he felt humiliated, and that he turned his back to the formation until the prayer, which was explicitly Christian, ended. Id.

For the rest of the night, Marrero worked with his immediate supervisor, defendant Cruz-Domínguez ("Cruz"). Between tears, Marrero told Cruz that he felt humiliated and upset because of the incident with Calixto. Id. at ¶ 27. After their chat, Cruz asked Marrero to hand over his weapon because he was allegedly in an "emotional state." Id. at ¶ 28.

Three days after the incident, Marrero filed an administrative complaint with the PRPD's Administrative Investigation Division, alleging that his constitutional right of freedom of religion had been violated. Id. at ¶ 29. Two days after filing his complaint, Marrero met with defendant Mario Rivera ("Rivera"), Chief of the Carolina Precinct of the PRPD.

In response to his complaint, Rivera told Marrero that he had two options: either to report to the Command Office for clerical tasks in the office or to stay in the airport station to perform vehicle-maintenance tasks. Id. at ¶ 32. Plaintiff chose the latter. Id. Since the meeting with Rivera, Marrero has not performed the usual law-enforcement tasks of a regular police officer. Id. at ¶ 33.

## STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant may move to dismiss an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion, the complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqbal, 556 U.S. 662 (2009).

The First Circuit distilled from Twombly and Iqbal a two-pronged test designed to measure the sufficiency of a complaint. Ocasio-Hernández v. Fortuño Burset, 640 F.3d 1 (1st Cir. 2011). First, the reviewing court must identify and disregard "statements in the complaint that merely offer legal conclusions couched as fact, or threadbare recitals of the elements of a cause of action." Ocasio-Hernández, 640 F.3d at 12 (internal punctuation omitted). In this analysis, the remaining non-conclusory factual allegations must be taken as true, even if

they are "seemingly incredible," or that "actual proof of those facts is improbable." Id. Finally, the court must assess whether the facts taken as a whole "state a plausible, not merely a conceivable, case for relief." Id.

In conducting this test, a court must not attempt to forecast the likelihood of success even if recovery is remote and unlikely. Ocasio-Hernández, 640 F.3d at 12. Thus, "[t]he relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the Court to draw from the facts alleged in the complaint." Id. at 13.

**DISCUSSION**

I.   Supervisory Liability

In their first motion to dismiss, Defendants argue that the complaint does not allege sufficient facts to sustain its claims of supervisory liability against Hector Pesquera, the PRPD Superintendent, ("Pesquera") and William Orozco, the Carolina Area Commander of the PRPD ("Orozco"). (Docket No. 59). A cursory review of the complaint shows that Defendants are right. For the reasons that follow, Plaintiffs' claims against Pesquera and Orozco are dismissed with prejudice.

Liability under § 1983 "cannot rest solely on a defendant's position of authority." Ocasio–Hernández, 640 F.3d at 16. At a minimum, the complaint must plead that each defendant was

*personally* involved in the alleged constitutional violation. See Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)(holding that, for liability under § 1983 to attach, supervisory defendants must be affirmatively linked to the alleged constitutional violations). Thus, in the absence of personal and intentional conduct, supervisory responsibility by itself is not sufficient to survive a motion to dismiss. See Peñalbert Rosa v. Fortuño Burset, 631 F.3d 592, 595 (1st Cir. 2011) ("bald assertions" and "unsupportable conclusions" are insufficient to establish personal participation in the unlawful conduct).

Regarding Orozco, the Complaint only alleges that he is the Carolina Area Commander of the PRPD. (Docket No. at ¶ 13). The complaint is barren of any factual allegations concerning Orozco's knowledge or endorsement of, let alone participation in, the challenged conduct. The claims against him must therefore be dismissed.

On the other hand, the complaint alleges that Pesquera had actual or constructive "knowledge of the customs, practices, and policies alleged of herein." (Docket No. at ¶ 40). It also claims that Pesquera "has ignored, promoted and/or endorsed the unlawful police conduct" alleged in the complaint. (Id.). But this is still not enough. As this Court has mentioned before, not just any act or omission leads to liability. When pressing a claim of supervisory liability, the plaintiff must go further

and show that "the supervisor acted with *deliberate indifference* to plaintiff's constitutional rights." <u>Villanueva-Cruz v. Puerto Rico</u>, 2012 WL 1712691 (D.P.R. May 15, 2012)(citing <u>Camilo-Robles v. Hoyos</u>, 151 F.3d 1, 7 (1st Cir. 1998)). "This level of indifference is shown where 1) there exists a grave risk of harm; 2) the official has actual or constructive knowledge of that risk; and 3) the official fails to take easily available measures to address that risk." <u>Id.</u> Moreover, the plaintiff must demonstrate that the supervisor's actions, either explicitly or through "tacit approval [], acquiescence [], or purposeful disregard," resulted in the constitutional violation asserted. <u>Id.</u>

The complaint at bar does nothing to show just *how* Pesquera "ignored, promoted [or] endorsed" the officers' actions, or even whether Pesquera could have taken measures to avoid the outcome of that meeting. Moreover, there is no indication that Pesquera was even aware of the conduct displayed by the officers. Simply put, without further factual enhancement, the allegations presented in the complaint are threadbare. As such, Plaintiffs' claims against Pesquera must be dismissed.

II. <u>Plaintiffs have adequately stated an Establishment Clause claim</u>

Defendants also move for dismissal on the basis that Plaintiffs have not properly pled a § 1983 claim for violations

of Marrero's rights under the First Amendment. (Docket No. 60). The Court is not persuaded.

The Establishment Clause proscribes Congress from making laws "respecting an establishment of religion." U.S. Const. amend. I. As it concerns us here, Plaintiffs' claim centers on state-sponsored prayer. Plaintiffs contend that an official of the Commonwealth of Puerto Rico coerced Marrero to observe a prayer during an official meeting, against both his will and his beliefs. To date, the Supreme Court has analyzed government-sponsored prayer under roughly three standards: the three-prong framework set forth in Lemon v. Kurtzman, 403 U.S. 602 (1971); the endorsement test, which aims to complement and "clarif[y] the Lemon test as an analytical device, Lynch v. Donnelly, 465 U.S. 668, 689 (1984) (O'Connor, J., concurring); and the "coercion" test adopted in Lee v. Weisman, 505 U.S. 577, 587 (1992).[1]

---

[1] Courts have recognized two broad categories of cases involving violations to the Establishment Clause: "insider" and "outsider" cases. Kerr v. Farrey, 95 F.3d 472, 478 (7th Cir. 1996). "Insider cases" exist when existing religious groups seek some benefit from the state or in which the state wishes to confer a benefit on such a group (or groups). In "outsider cases," like the one at bar, the state imposes religion on an unwilling subject. In Kerr, the Seventh Circuit clarified that while the Lemon test is the appropriate analytical framework to assess insider cases, outsider cases require the approach outlined in Lee v. Weisman, 505 U.S. 577, 587 (1992).

Case 3:13-cv-01203-JAG   Document 74   Filed 08/19/14   Page 9 of 16
**CIVIL NO.** 13-1203 (JAG)                                                                          9

While the Supreme Court still "wrestl[es] with the precise content of these principles," Kerr v. Farrey, 95 F.3d 472 (7th Cir. 1996), one thing is clear: "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." Lee, 505 U.S. 577, 587 (recognizing that unconstitutional coercion may be exercised both directly, such as by mandatory attendance at a religious exercise, and indirectly).

From Lee, the Seventh Circuit fashioned a three-pronged test to determine whether the state has violated, through coercion, a person's rights under the Establishment Clause: "first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious or secular?" Kerr, 95 F.3d at 479. Though the First Circuit has not yet expressed its position on Kerr, the Eighth and Ninth Circuits have adopted this test, noting that it is "particularly useful" in "determining whether there was governmental coercion of religious activity." Inouye v. Kemna, 504 F.3d 705, 713 (9th Cir. 2007); Jackson v. Nixon, 747 F.3d 537, 542 (8th Cir. 2014). Because the situation at hand is sufficiently analogous to that in Kerr, Jackson and Inouye and because the Court understands

that the test accurately distills the teachings of Lee, the Court shall adopt it here.[2]

The first prong of the test is whether the state has acted; here, there is no doubt it has. Defendants were all PRPD officers, and, because the meeting was called to organize a PRPD intervention, they were all acting in their official capacity. Plaintiffs have therefore met the first prong.

Second, the action was plainly coercive. That night, Marrero stood in formation among forty other officers. When he asked for permission to leave the formation during the prayer, the commanding officer forced the Plaintiff to observe the prayer, against his will and his own religious beliefs. We note, furthermore, this was the first time he spoke up as an atheist during his thirteen year tenure with the PRPD. Since expressing

---

[2] The common denominator between these cases is that the person was coerced into trading their religious liberty for some benefit or in order to avoid adverse consequences. See Inouye, 504 F.3d 714 ("The Hobson's choice [parole officer] Nanamori offered Inouye —to be imprisoned or to renounce his own religious beliefs— offends the core of Establishment Clause jurisprudence."); Jackson, 747 F.3d (finding a plausible Establishment Clause violation where plaintiff alleged he was required to attend and complete a nonsecular substance abuse treatment program in order to be eligible for early parole); Kerr, 95 F.3d (similar to Jackson). Here, Marrero faced a similar choice: be silent and remain with his duties as an officer, or exercise his First Amendment rights and be relegated to vehicle maintenance tasks. "It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice." Lee, 505 U.S. at 596. It is equally evident that the State cannot punish an individual for expressing such resistance.

his own beliefs about the prayer, his gun was taken away and he no longer performs the regular duties of a PRPD officer.

The final element of the test requires that the object of the coercion be religious. Calixto took care of that when he explained to the officers that Plaintiff was standing apart from everyone else because "he didn't believe in what" the rest of the officers believed. In addition, the complaint flatly alleges that this prayer, as well as those given at previous meetings, was a Christian prayer. Thus, the Court finds this element met as well.

Accordingly, in light of the above, the Court finds that Plaintiffs have established a plausible Establishment Clause violation. Defendants' motion to dismiss this claim is denied.

III. Defendants are not entitled to qualified immunity

Finally, Defendants raise a qualified immunity defense. This defense protects executive-branch officials from liability so long as their conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800 (1982).

As a threshold matter, we note that the defense does not shield government officials from claims for equitable relief. See Lugo v. Alvarado, 819 F.2d 5, 7 (1st Cir. 1987) (holding that "a defense of qualified immunity is totally immaterial" to

a request for injunctive relief). Thus, Defendants' qualified immunity defense against Plaintiffs' claims for equitable relief fails.

Courts employ a two-part test to determine whether qualified immunity is available, asking (1) "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Pearson v. Callahan, 555 U.S. 223, 224; see also Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). Previously, the Court found that Plaintiffs have adequately pled an Establishment Clause violation. With the first prong met, we turn to the second one.

Here, the question is whether the law was clear at the time of the alleged violation and whether a reasonable defendant would have understood that his conduct violated an individual's constitutional rights. Pearson, 555 U.S. at 223. In conducting this analysis, "a court should 'use its full knowledge of its own [and other relevant] precedents.'" Elder v. Holloway, 510 U.S. 510, 516 (1994). Moreover, the Court "should search the relevant authorities both in circuit and out of circuit." Barton v. Clancy, 632 F.3d 9, 22.[3] Although earlier cases involving

---

[3] See also El Dia, Inc. v. Rossello, 165 F.3d 106, 110 n. 3 (1st Cir. 1999) (declining to adopt "a hard-and-fast rule" that out-

"fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The Court finds that the state of law in March 2012 would have enabled a reasonable police officer to conclude that ordering a subordinate to observe a religious prayer given during an official meeting - *without giving the subordinate the ability to opt out* - would violate the Constitution of the United States. Again, "the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." Lee v. Weisman, 505 U.S. 577, 587 (1992) (finding that the students, at a graduation ceremony, were forced to participate in a specific institutionalized message). Following this principle, courts have invariably found Establishment Clause violations in situations where the state actor did not allow an individual the opportunity to leave the religious prayer. For example, in Milwaukee Deputy Sheriffs, the county sheriff invited members of a Christian church to mandatory deputy roll call meetings so they could present their

---

of-circuit precedent is either determinative of or irrelevant to whether a law is clearly established, and instead stating that whether precedent "clearly establishes" a law may depend in part upon "the location and level of the precedent, its date, its persuasive force, and its level of factual similarity to the facts before this Court").

religious message and proselytize. Milwaukee Deputy Sheriffs Ass'n v. Clarke, 513 F. Supp. 2d 1014, 1021 (E.D. Wis. 2007) aff'd sub nom. Milwaukee Deputy Sheriffs' Ass'n v. Clarke, 588 F.3d 523 (7th Cir. 2009). The Seventh Circuit found that the religious nature of the church members' presentation, combined with the fact that the sheriff had invited them to speak at mandatory deputy meetings, signaled to the deputies that the sheriff endorsed the religious message being conveyed. Id. Thus, the deputies were coerced to participate or at least remain present at the presentations for fear of losing their jobs. Id. In contrast, courts have found no Establishment Clause violation when the state actor allows the plaintiff an option to leave the prayer. See, e.g., Kaplan v. City of Chicago, No. 05 C 2001, 2009 WL 804066, at *2 (N.D. Ill. Mar. 27, 2009)(finding no constitutional infirmity with prayer at meeting because plaintiff's commanding officer allowed plaintiff to leave, and also offered to change the plaintiff's assignment so that she would no longer be in the pool of officers possibly assigned to attend those meetings).

Here, the Court finds that the Defendants' actions fall on the wrong side of the spectrum. At the meeting in question, there were forty police officers standing in a military formation when the commander asked for a volunteer to lead the prayer. Though Plaintiff specifically informed his commanding

officer that he felt uncomfortable and "that he did not want to participate" in the prayer, he was not allowed to leave. He was forced to stand still and watch his fellow officers express religious beliefs to which he does not subscribe.

To make matters worse, Plaintiff was marginalized for not "believing in [what his fellow officers] believed in." This is particularly troublesome in the context of this case, as law enforcement officers may be particularly vulnerable to employer coercion given their strict chain of command. Milwaukee Deputy Sheriffs Ass'n v. Clarke, 513 F. Supp. 2d 1014, 1021 (E.D. Wis. 2007); see also Mellen v. Bunting, 327 F.3d 355, 371 (4th Cir. 2003) (stating that cadets at the Virginia Military Institute were "uniquely susceptible to coercion" due to the Institute's detailed regulation of conduct and its philosophy of "[o]bedience and conformity"). In short, qualified immunity does not shield a police officer from liability where he forces a subordinate to observe religious prayer at an official meeting. For these reasons, the Court finds that Defendants' qualified immunity defense fails.

## CONCLUSION

In light of the above, Defendants' motions to dismiss are granted solely as to Plaintiffs' claims against co-defendants Pesquera and Orozco. Everything else remains.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, on August 19, 2014.

<u>S/ Jay A. Garcia-Gregory</u>
JAY A. GARCIA-GREGORY
United States District Judge
